# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TERESA FEYEN**
           **Plaintiff,**

    **v.**                              **Case No. 13-C-1380**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
               **Defendant.**

---

## DECISION AND ORDER

Plaintiff Teresa Feyen applied for social security disability benefits, claiming that she could not work due to depression, narcolepsy, migraine headaches, and carpal tunnel syndrome. Denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ also found her non-disabled. After the Appeals Council denied review, the ALJ's decision became the final word from the Commissioner of Social Security on plaintiff's application. See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013).

Plaintiff now seeks judicial review of the denial. The district court reviews the ALJ's decision to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria. Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Moore v. Colvin, 743 F.3d 1118, 1120-21 (7th Cir. 2014). This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that the court scours the record for supportive evidence; rather, the ALJ must identify the

relevant evidence and build a logical bridge between that evidence and his conclusion. <u>Moon v. Colvin</u>, No. 13-3636, 2014 WL 3956762, at *2 (7th Cir. Aug. 14, 2014). Without a logical bridge between the evidence and the ALJ's conclusions, the court must vacate and remand for further proceedings. <u>Blakes ex rel. Wolfe v. Barnhart</u>, 331 F.3d 565, 570 (7th Cir. 2003). The ALJ is also expected to follow the agency's own rulings and regulations in making his determination; failure to do so, unless the error is harmless, also requires remand. <u>Retlick v. Astrue</u>, 930 F. Supp. 2d 998, 1000 (E.D. Wis. 2012).

## I. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff applied for benefits on December 18, 2010, alleging a disability onset date of December 10, 2010. (Tr. at 139.) In a function report, plaintiff complained of chronic fatigue and difficulty concentrating due to her impairments. She indicated that she worked part-time, twelve to fifteen hours per week. On work days, she would go in for four to six hours, come home, eat lunch, then take a nap; after that she would watch TV until bed time because she was too tired to do anything else. (Tr. at 204.) On non-work days, she would try to accomplish one task, such as cleaning, housework, or grocery shopping. After completing her one task for the day, she would lay down at 1:30-2:00 for a nap, getting up at 3:30-4:00. She was usually too tired to do much at that point and so caught up on e-mail or watched TV. She would then make supper and go to bed. (Tr. at 197.) She indicated that she had to carefully plan every day because she could accomplish just one task per day. Her energy drained quickly despite being on a high dose of Adderall. (Tr. at 204.) Plaintiff also indicated that she could no longer drive more than ½ hour due to fatigue caused by her narcolepsy. If she did not

take her medication she could sleep 14 hours, be up one and a half hours, and then take a three hour nap. (Tr. at 198.)

Regarding her personal care, plaintiff indicated that she did not shower every day because she was too tired; she cut her hair short because it would wear her out to fix it everyday; and that if tired and hungry she'd put off food for sleep. (Tr. at 198.) She took two doses of Adderall and had to set the alarm on her watch as a reminder to take the second dose. She made simple meals such as frozen pizza and box dinners, occasionally a casserole. (Tr. at 199.) She indicated that she could handle money but sometimes forgot to record things in the checkbook. As hobbies, she walked her dogs and played on the computer. In the summer, she tried to take the dogs for a hike once per week; in the winter they went nowhere. She used to get out with the dogs two to three times per week in the summer and once per week in the winter. (Tr. at 201.)

Plaintiff reported no problems getting along with others but rarely attended social events. She indicated that her memory and concentration had deteriorated; she could complete a task, but it took a lot longer than it used to. She could pay attention for ten to fifteen minutes and eventually finish what she started. She followed written instructions well and could follow simple, one or two step, spoken instructions. (Tr. at 202.) She indicated that she got along well with authority figures and could handle changes in routine, but did not handle stress very well. (Tr. at 203.)

## B.  Medical Reports

Plaintiff supported her application with a report from her treating psychiatrist, Mary Kirkwood, M.D. Dr. Kirkwood indicated that she had been treating plaintiff for over two years for major depression, including symptoms of dysphoria, tearfulness, poor energy, anhedonia,

3

and worthlessness, which were pervasive despite medication changes. These symptoms were compounded by her diagnosis of narcolepsy, which resulted in excessive daytime sleepiness in spite of aggressive treatment with stimulants. Dr. Kirkwood indicated that plaintiff's sleepiness was evident during appointments, and she had no doubt that plaintiff had significant difficulty staying awake during the day. Although plaintiff currently worked four, sometimes six, hour shifts, she was often criticized by her employer for working too slowly, and on days she worked she had no energy for anything else. (Tr. at 352.) Dr. Kirkwood indicated that plaintiff would be absent from work more than twice per month due to her symptoms. (Tr. at 355.) Dr. Kirkwood further indicated that plaintiff had a marked degree of restriction in activities of daily living ("ADL's"); marked difficulty in maintaining social functioning; frequent deficiencies of concentration, persistence, and pace ("CPP"); and repeated episodes of decompensation in work or work-like settings. (Tr. at 357-58.)

For its part, the agency obtained reports from several consultants. Dr. Pat Chan completed a physical residual functional capacity ("RFC") assessment, finding plaintiff capable of light work, but avoiding heights and hazards due to her narcolepsy. (Tr. at 94-95.) Jack Spear, Ph.D., completed a psychiatric review form, finding no restriction in ADL's, no difficulties in social functioning, and moderate difficulties in CPP. (Tr. at 92.) Dr. Spear further indicated, in a mental RFC assessment, that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; and complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without unreasonable breaks. (Tr. at 95-96.) Despite the moderate CPP limitations, Dr. Spear found plaintiff capable of the basic mental demands of unskilled work. (Tr. at 96.) Craig

4

Childs, Ph.D., later concurred with Dr. Spear's assessment. Dr. Childs noted a history of major depressive disorder in which the etiology appeared multi-factoral due to the season, fatigue, and time of month. Plaintiff's depression seemed to improve when her energy levels were up. Fatigue was also a problem with a provisional diagnosis of narcolepsy. Her doctors had tried different medications to battle her fatigue. However, Dr. Childs indicated that there were no instances of falling asleep when driving, sitting, or doing things, mainly significant daytime fatigue, requiring multiple naps. Dr. Childs thus concurred with the previous assessment of moderate difficulties in CPP, but with plaintiff remaining capable of withstanding the demands of unskilled work. (Tr. at 345.)

## C.    The Hearing

At her hearing before the ALJ, plaintiff testified that she was 39 years old, with a high school diploma and some additional vocational training in cosmetology. (Tr. at 67-68.) She indicated that she worked part-time at an animal boarding facility, caring for and grooming the animals, administering medication, and cleaning the enclosures. (Tr. at 68-69.) She worked four hours per day, which she had cut down from six hours due to exhaustion, four days per week. (Tr. at 69-70.) She indicated that in 2007, at her previous job managing a barbershop, she fell asleep at her desk. (Tr. at 70.) Plaintiff testified that she could no longer perform her past work as a barber/cosmetologist due to her carpal tunnel syndrome, which caused her hands to go numb; she had surgery, but it didn't help. (Tr. at 71.)

Plaintiff testified that she started experiencing sleep problems in high school, which worsened in 2005-2006. She underwent a sleep study in 2007 (Tr. at 71), which showed a very high probability of narcolepsy (Tr. at 324). Plaintiff testified that on the days she worked she was unable to do anything at home. (Tr. at 71.) After she finished her four-hour shift, she took

a nap, which lasted from one to three hours. Her doctor ordered her to takes naps. (Tr. at 72.)

Plaintiff took Adderall, which helped at first but now not so much; two hours after she took it should could be sleeping. (Tr. at 72.) Her employer indicated that she was too slow and did not keep pace to his standards. Plaintiff indicated that she never had days without fatigue or insufficient energy. She slept anywhere from nine to twenty hours per day. She could do chores around the house if she did not work that day. After vacuuming, she had to rest for at least an hour. She could do the grocery shopping, but it took her two to three hours because she got side-tracked. (Tr. at 73.) She also testified to problems driving, not allowing herself to go any further than half an hour away without someone with her; she would be too tired to make it home without falling sleep at the wheel. She cooked frozen dinners or box dinners; occasionally she would have the energy to cook from scratch, but she could not then do the dishes. (Tr. at 74.) Her husband helped with the housework. (Tr. at 74-75.)

Plaintiff testified that her narcolepsy also caused hallucinations where she would see people who weren't there or hear somebody calling her name. (Tr. at 75.) She also testified to two incidents of "cataplexy" – where she could not move her body. (Tr. at 75-76.) She indicated that she used to like walking her dogs and doing crafts but rarely did those things now. She had no close friends and rarely saw her family. Her depression caused her to clam up and keep to herself when stressed. (Tr. at 76.) She reported no problems with co-workers but did butt heads with her boss. (Tr. at 77.) She did not shower every day because it was too exhausting. She also reported trouble concentrating and needing to read a recipe four to five times before understanding it. (Tr. at 77.) She reported crying jags twice per week, lasting ten minutes to a few hours. (Tr. at 78) She took Pristiq for depression and Propranolol for headaches; she still got migraines around her menstrual cycle lasting about five days. (Tr. at

6

78-79.) During those five days, two or three would be pretty severe, but the other two she could function. (Tr. at 79.)

Despite bilateral carpal tunnel surgery, plaintiff reported still having problems with her hands and wrists. After being on the computer for 20 to 30 minutes her hand would go numb. Doing her hair also caused problems. She no longer got shooting pains but still had numbness. (Tr. at 80.)

The ALJ then turned to a vocational expert ("VE"), asking a hypothetical question assuming a person of plaintiff's age and education, capable of light work, that was non-complex (defined as no arbitration, no mediation, no negotiation, and no call center work), low stress (defined as low production quota), and involved no unprotected heights, moving machinery, or driving. (Tr. at 82-83.) The VE indicated that such a person could work as a wire worker, electronics worker, and bench hand. (Tr. at 83-84.) If the person could not maintain attention for two hours or more, all jobs would be eliminated. Two or more absences per month would also be vocationally unacceptable. (Tr. at 85.)

## D.    The ALJ's Decision

In his decision, the ALJ found that plaintiff suffered from the severe impairments of affective disorder, narcolepsy, headaches, and carpal tunnel syndrome, none of which qualified as conclusively disabling. (Tr. at 21.) The ALJ then found that plaintiff retained the RFC for light work; that was not complex (including no arbitration, mediation, or negotiation, and no call center work); limited to low stress work with low production quotas; with no work at unprotected heights, around moving machinery, or driving. (Tr. at 23.) In making this finding, the ALJ discounted plaintiff's testimony of more severe limitations. (Tr. at 23-24.) He also rejected Dr. Kirkwood's opinion, instead finding the agency consultants' reports consistent with the evidence

7

and plaintiff's daily functioning. (Tr. at 25.) Based on this RFC, the ALJ concluded that plaintiff could not perform her past work but could do other jobs as identified by the VE, including wirer, electrical worker, and bench hand. (Tr. at 25-26.)

## II. DISCUSSION

Plaintiff argues that the ALJ erred in evaluating credibility, Dr. Kirkwood's report, and the agency consultants' reports. I address each argument in turn.

## A. Credibility

### 1. Legal Standards

While a social security claimant cannot be found disabled based on her alleged symptoms alone, her statements regarding the intensity, persistence, and functionally limiting effects of those symptoms must be evaluated to determine the extent to which they affect her ability to do basic work activities. SSR 96-7p, 1996 WL 374186, at *1. In assessing the credibility of a claimant's statements, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. SSR 96-7p, 1996 WL 374186, at *2. If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's symptoms, the symptoms cannot be found to affect her ability to work. Id. If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must determine the extent to which the symptoms limit the claimant's ability to work. Id. For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a

consideration of the entire case record, including the claimant's daily activities; the duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and any other measures or treatment the claimant uses to relieve the symptoms. Id. at *2-3. The ALJ may not discredit the claimant's testimony based solely on a lack of objective medical support. Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

The reviewing court will give "an ALJ's credibility determination special, but not unlimited, deference." Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012); see also Schomas, 732 F.3d at 708 ("We give special deference to an ALJ's credibility determination and will not overturn it unless it is patently wrong."). The ALJ must consider the pertinent regulatory factors and then provide specific reasons for his credibility determination, supported by the evidence in the case record and articulated in the decision. See SSR 96-7p, 1996 WL 374186, at *4; Shauger, 675 F.3d at 696. The ALJ must explain his decision in such a way that allows the court to determine whether he reached it in a rational manner, logically based on his specific findings and the evidence in the record. Murphy v. Colvin, No. 13-3154, 2014 WL 3586260, at *3 (7th Cir. July 22, 2014). If the ALJ bases his credibility determination on objective factors or fundamental implausibilities rather than subjective considerations like demeanor, the court has greater freedom to review it. Schomas, 732 F.3d at 708.

## 2.    Analysis

In the present case, the ALJ first summarized plaintiff's testimony, noting that plaintiff alleged limitations due to her narcolepsy, carpal tunnel, and depression. She stated that she went home after her four-hour shift and took a nap, and that she slept from nine to twenty hours per day. She indicated that she needed to take a nap after doing household chores or

grocery shopping. She did not drive more than 30 minutes away due to concerns that she would fall asleep at the wheel. She stated that she had hallucinations, including seeing people and hearing things. She also reported memory problems and lack of interest in doing things. She stated that Adderall no longer helped her. She further stated that she got migraines during her menstrual period, and that they lasted about five days. She also stated that her right hand went numb after 30 minutes on the computer. (Tr. at 23.)

The ALJ then set forth a "pernicious bit of boilerplate," frequently condemned by courts in this circuit, but "to which the Social Security Administration nevertheless clings." Browning v. Colvin, No. 13-3836, 2014 WL 4370648, at *5 (7th Cir. Sept. 4, 2014). The ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 24.) "The implication [of this boilerplate] is that the assessment of the claimant's ability to work precedes and may invalidate the claimant's testimony about his or her ability to work. Actually that testimony is properly an input into a determination of ability to work." Browning, 2014 WL 4370648, at *5; see also Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012) ("[T]he assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards."). The Seventh Circuit has "held, however, that the use of such boilerplate language will not automatically discredit the ALJ's ultimate conclusion if the ALJ otherwise identifies information that justifies

the credibility determination." Moore, 743 F.3d at 1122.

In the present case, the ALJ went on to state that while plaintiff had limitations, the records reflect that she should be able to sustain work that is simple and low stress without hazards. (tr. at 24.) The ALJ then discussed plaintiff's part-time work and the medical evidence.[1]

### a.     Part-Time Work

The ALJ noted that plaintiff worked part-time at an animal boarding facility, caring for and grooming the animals, administering medication, and cleaning the facilities. (Tr. at 24.) The regulations require evaluation of the claimant's ability to sustain full-time work. See SSR 96-8p, 1996 WL 374184, at *1; see also Elder v. Astrue, 529 F.3d 408, 414 (7th Cir. 2008). As the Commissioner notes, however, a claimant's ability to work part-time or engage in other daily activities may undercut her claims regarding the limiting effects of her impairments. See, e.g., Williams-Overstreet v. Astrue, 364 Fed. Appx. 271, 277 (7th Cir. 2010) ("It was reasonable for the ALJ to conclude that Mrs. Overstreet's job at the airport – transporting passengers in a golf cart, and sometimes pushing them in wheelchairs, six hours a day, four days a week – suggested that her impairments did not limit her as much as she claimed, and that she could perform sedentary work as a data-entry clerk or administrative assistant."). But the ALJ must

---

[1]The Commissioner contends that the ALJ also discussed plaintiff's daily activities, finding them inconsistent with her claim of disability. The only activity the ALJ discussed in connection with credibility was plaintiff's part-time work. The ALJ mentioned plaintiff's function report in evaluating Dr. Kirkwood's opinions but not credibility. In any event, the ALJ failed to specify what in the function report contradicted plaintiff's disability claim. The Commissioner discusses the report in some detail (Def.'s Br. at 4-5), but "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

11

explain <u>how</u> the claimant's activities undermine her allegations.  <u>See Jelinek v. Astrue</u>, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.") (internal citation omitted); <u>Lewis v. Commissioner of Social Sec.</u>, No. 2:12-cv-241, 2013 WL 4670202, at *7 (N.D. Ind. Aug. 30, 2013) (affirming where the ALJ pointed to activities contradicting the claimant's statements that she was limited to standing or sitting for a handful of minutes at a time).  In the present case, plaintiff's primary contention is that fatigue prevents her from working full-time.[2]  The ALJ offered no explanation as to how plaintiff's part-time work undermined that claim or otherwise diminished her credibility.[3]

### b.    Medical Evidence

The ALJ summarized some of the medical records, but he offered little in the way of analysis.  <u>See Faust v. Colvin</u>, No. 13-CV-323, 2014 WL 348181, at *2 (W.D. Wis. Jan. 31, 2014) (reversing where the ALJ offered "a list of different pieces of evidence from the record with little explanation of the importance of the evidence or how it fits together").[4]  The ALJ also overlooked records supportive of plaintiff's claims.  "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."  <u>Denton v. Astrue</u>, 596

---

[2]Plaintiff further stated that her employer found her "too slow and . . . not keeping up pace to his standards."  (Tr. at 73.)

[3]For instance, the ALJ did not indicate that plaintiff's part-time work involved tasks beyond her alleged exertional capacity, as in the <u>Lewis</u> case, cited in the text.

[4]The ALJ's discussion of the Listings suffered from the same flaw.  (Tr. at 22.)

F.3d 419, 425 (7th Cir. 2010).

### i. Narcolepsy

The ALJ first discussed some of the records regarding plaintiff's narcolepsy, noting that plaintiff underwent a nocturnal polysomnography in February 2007, which did not show evidence of obstructive sleep apnea. Plaintiff never claimed to have sleep apnea, so it is unclear why the ALJ cited this evidence. See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). The ALJ noted that a Multiple Sleep Latency report suggested a very high probability of narcolepsy, but a second opinion, referenced in a July 2010 note from Dr. Kirkwood, determined that she did not have narcolepsy. (Tr. at 24.) The ALJ previously found that plaintiff's narcolepsy qualified as a severe impairment (Tr. at 21), so his purpose in citing this evidence is also a mystery. Did the ALJ believe plaintiff had severe narcolepsy or not?[5]

The ALJ next noted that on January 14, 2011, plaintiff reported that Adderall 90 mg was helping, and on September 14, 2011, she reported sleeping better at night, and her medications were not making her tired during the day, although she did still have some daytime sleepiness. (Tr. at 24.) The ALJ did not say, but presumably he believed these notes contradicted plaintiff's hearing testimony that Adderall no longer worked very well, and that she still got tired after taking it. (See Tr. at 72.) Read as a whole, the notes reveal no significant contradiction. On January 14, 2011, plaintiff advised Dr. Kirkwood that Dr. Phillips had

---

[5]On September 10, 2010, Dr. Elliott Phillips, plaintiff's treating sleep specialist, confirmed his belief that plaintiff had narcolepsy. (Tr. at 303.) The ALJ did not discuss this evidence.

increased her Adderall to 90 mg in the morning and 90 mg in the early afternoon, which helped, although her energy continued to decline through the day. Even with the increased medication, plaintiff advised her employer she could not work more than six hours; after a six hour shift, she could not do anything further at home other than 15 minutes of low intensity activity like some laundry. (Tr. at 339.) Dr. Kirkwood indicated that she did not think plaintiff was able to work, and that she strongly supported an application for disability. (Tr. at 257.) On September 14, 2011, plaintiff reported that her mood was somewhat better on Pristiq and Abilify, but she still struggled with sleepiness during the day. Dr. Kirkwood encouraged her to get an attorney to help her get social security benefits, stating "I do truly think she is disabled from her narcolepsy." (Tr. at 368.)

Finally, the ALJ stated: "The records do not reflect instances of falling asleep when driving, sitting or doing other activities." (Tr. at 24.) The record includes several such references. A December 20, 2010, note from Dr. Kirkwood states: "She has felt herself doze while driving." (Tr. at 258.) A September 2, 2010, note indicates: "She actually pulled into a parking lot and felt frozen as if she forgot how to drive." (Tr. at 264.) On February 8, 2010, plaintiff reported that the Adderall helped at first, but now noticed it wearing off at 3:00 or 4:00 in the afternoon; she avoided doing things like going to Green Bay because she feared falling asleep while driving. (Tr. at 274.) On May 30, 2007, plaintiff reported to Dr. Phillips "feeling tired and sleepy during the day and falling asleep at work, almost with the experience of 'sleep attacks.'" (Tr. at 389.)

## ii.    Headaches

The ALJ then turned to the medical evidence regarding plaintiff's "alleged headaches,"[6] noting that in February 2010 plaintiff reported improvement in her migraines on Propranolol, which she took without difficulty or side effects. (Tr. at 24.)  On August 25, 2010, plaintiff again reported doing well with Propranolol, with migraines twice a month, which were "nothing she cannot handle."  (Tr. at 24.)  The ALJ accurately summarized these notes, but both pre-date the alleged disability onset date (December 10, 2010), and later notes show that plaintiff's headaches continued to be a significant problem.

On November 21, 2011, plaintiff saw Dr. Karen Betten, indicating that she had run out of Propranolol, which in any event wasn't working as well before she ran out.  Plaintiff reported headaches around her menstrual period lasting four to five days; otherwise, she got headaches one or more times per week. (Tr. at 401.)  Dr. Betten put her back on Propranolol, but doubled the dose and considered adding Topamax. (Tr. at 402.)  The ALJ skipped this note, jumping ahead to January 2012, when plaintiff reported that the Propranolol had been working well except that she was still getting migraines at the time of her menses.  (Tr. at 24, 399.)  Dr. Betten found it necessary to add another medication, Amerge, to take at the outset of a headache (Tr. at 400), evidence the ALJ overlooked.  As the ALJ conceded, in April 2012, plaintiff reported that her headaches had worsened, lasting longer. (Tr. at 24, 397.)  Dr. Betten again increased the Propranolol dose. (Tr. at 398.)  The ALJ noted that plaintiff was later placed on Topamax, which she tolerated well, and by August 14, 2012, she reported a decrease in headache frequency and intensity and did not get a headache until her last

---

[6]The ALJ found plaintiff's headaches to be a severe impairment, so it is unclear why he referred to them as "alleged."

menstrual period in early August 2012. (Tr. at 24.) Again, the notes say more. On July 10, 2012, plaintiff saw Linda Ahrens, NP, noting that Excedrin and Amerge relieved her headaches, but she had to take these medications for several days to relieve a single headache. (Tr. at 395.) NP Ahrens added Topamax (Tr. at 393, 396), and during their August 14, 2012, appointment, plaintiff did report a decrease in headache frequency and intensity. Nevertheless, she reported a five day headache with her last menstrual period (Tr. at 393), and NP Ahrens recommended an increased Topamax dose during the week of her period (Tr. at 394). This was entirely consistent with plaintiff's hearing testimony – that she continued get migraines around her menstrual cycle. (Tr. at 78.) She testified that they usually lasted five days, and that the headaches left her unable to function two or three of those five days. (Tr. at 79.) The ALJ did not specifically address whether plaintiff was credible in this regard; according to the VE, two absences per month would be unacceptable to employers. (Tr. at 85.)[7]

### iii.    Affective Disorder

Finally, regarding her mental health issues, the ALJ noted that plaintiff tried several different medications, including Effexor, Pristiq, and Abilify, and by September 14, 2011, she reported a somewhat better mood. She was also sleeping better at night, the nausea resolved, and she was able to enjoy things more. (Tr. at 24.) On November 3, 2011, she reported that she was less depressed but still had some days where she was very down with crying spells, and her Abilify dose was increased. However, on January 6, 2012, she felt that the increase

---

[7]Regarding her carpal tunnel syndrome, the ALJ noted that plaintiff underwent surgeries in January 2011; at the hearing, she alleged that she still had problems with numbness, but this was not reflected in the medical records. (Tr. at 24.) In her brief, plaintiff cites medical records from 2008, but no post-surgical notes contradicting the ALJ's finding. Nor does she challenge the absence of manipulative limitations from the RFC.

did not help, and she had gained 22 pounds.  On May 9, 2012, she stated that her mood was fairly upbeat, and with the nice weather she had more energy.  She said she was "feeling better now than I have in a long time."  (Tr. at 25.)  On August 14, 2012, her mood was reported as "stable."  (Tr. at 25.)  The ALJ further noted no mental health hospitalizations, and the records did not reflect the alleged hallucinations.  (Tr. at 25.)

Again the ALJ did not specifically explain how any of these notes undercut plaintiff's credibility, and he skipped over psychiatric records suggesting more severe mental limitations.[8] For instance, on May 12, 2011, plaintiff told Dr. Kirkwood that she continued to struggle with low energy and fatigue on days she worked a six hour shift, despite being on Adderall 90 mg twice per day.  Her mood was depressed, and Dr. Kirkwood wanted to switch from Cymbalta to Pristiq, but plaintiff's insurance required she try Effexor first.  (Tr. at 331-32.)  On June 24, 2011, plaintiff reported nausea and increased headache on Effexor, so Dr. Kirkwood discontinued Effexor and started Pristiq. (Tr. at 329.)  On July 26, 2011, plaintiff reported feeling very depressed and needing a higher dose of medications; Dr. Kirkwood started her on Abilify.  (Tr. at 369.)  As discussed above, on September 14, 2011, plaintiff reported improved mood but continued to struggle with sleepiness.  (Tr. at 368.)  On November 3, 2011, plaintiff reported feeling less depressed on Abilify, but she still had some very down days with crying spells; Dr. Kirkwood increased the Abilify dose.  (Tr. at 367.)  On January 6, 2012, plaintiff reported that the increase in Abilify had not helped, and she had gained 22 pounds; Dr. Kirkwood discontinued Abilify and started Buspar.  (Tr. at 366.)  On February 9, 2012, plaintiff

---

[8]The ALJ was correct in noting that plaintiff had never been hospitalized, and that she did not mention her hallucinations to her doctors.  However, she did mention cataplexy-type symptoms.  (Tr. at 360.)

reported that she could not stop crying; Dr. Kirkwood started her on Lamictal and increased the Buspar. (Tr. at 364.) On March 6, 2012, plaintiff reported that her PMS symptoms continued to be severe, and since starting on the Lamictal she had been unable to take the necessary nap to get her energy back. She was still working four-hour shifts, but her boss sometimes had her working five to six days in a row; after such a stretch, she slept for 18 hours on Saturday and 13 to 14 on Sunday. Her mood remained depressed. (Tr. at 363.) On May 9, 2012, plaintiff reported more energy with the nicer weather and a decrease in her work hours; she had stopped taking Buspar but continued on Pristiq. (Tr. at 361.) In the final note from Dr. Kirkwood, dated August 10, 2012, plaintiff reported a difficult couple of months. Although she only worked four hour shifts, her boss put a lot of pressure on her to go faster, and as a result she experienced cataplexy-like symptoms in which her body did not feel as though it could move.[9] (Tr. at 360.)

### 3. Conclusion as to Credibility

"[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." Moore, 743 F.3d at 1123. "The error here is the failure to address all of the evidence and explain the reasoning behind the decision to credit some evidence over the contrary evidence, such that [the court] could understand the ALJ's logical bridge between the evidence and the conclusion." Id. at 1124. The matter must be remanded for reconsideration of plaintiff's credibility.

---

[9]Instead of discussing the most recent (8/10/12) record from Dr. Kirkwood, the ALJ plucked a single phrase – that plaintiff's mood had been "stable" – from the (8/14/12) record of the nurse practitioner plaintiff saw for her headaches. (Tr. at 393.)

**B.** **Dr. Kirkwood's Opinions**

**1.** **Legal Standards**

A treating doctor's medical opinion regarding the nature and severity of the claimant's impairment is entitled to "special significance" in determining RFC. SSR 96-8p, 1996 WL 374184, at *7. If the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record, the ALJ must give it "controlling weight." 20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he may not simply discard it; rather, he must determine what weight the opinion does deserve by considering a variety of factors, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. Scrogham v. Colvin, No. 13-3601, 2014 WL 4211051, at *10 (7th Cir. Aug. 27, 2014). The ALJ must always offer "good reasons" for discounting the opinion of a treating physician. Moore, 743 F.3d at 1127 (citing Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011)).

**2.** **Analysis**

The ALJ noted that on September 14, 2011, Dr. Kirkwood opined that plaintiff was disabled from her narcolepsy. In her report, Dr. Kirkwood assessed marked limitations in ADL's, social functioning, and CPP, and indicated that plaintiff would be absent from work more than twice per month. Dr. Kirkwood reported symptoms of dysphoria, tearfulness, poor energy, anhedonia, and worthlessness as well as excessive daytime sleepiness that caused plaintiff to work slowly and have no energy for any other activities during the day. The ALJ then tersely

concluded: "This opinion is given little weight as it is not supported by the evidence, particularly the claimant's own Function Report. The opinion as to disability is given no weight as it is a finding reserved for the Commissioner of SSA." (Tr. at 25.)

The ALJ failed to identify what in the evidence generally or the function report specifically he found inconsistent with Dr. Kirkwood's opinion.[10] See Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001) (indicating that the ALJ must identify inconsistent evidence in order to reject a treating source report). He also failed to consider the other regulatory factors for evaluation of treating source reports, including the length, nature, and extent of the treatment relationship, and Dr. Kirkwood's specialty. Finally, the ALJ committed legal error by rejecting the opinion as to disability because it touched on an issue reserved to the Commissioner. See Garcia v. Colvin, 741 F.3d 758, 760 (7th Cir. 2013). In Garcia,

> The administrative law judge gave "no weight" to the opinion of Garcia's treating physician that his patient was "disabled and unable to perform any functions." The judge's ground was that determining disability is reserved to the Commissioner of Social Security (by which the administrative law judge meant reserved to him). That isn't true. What is true is that whether the applicant is sufficiently disabled to qualify for social security disability benefits is a question of law that can't be answered by a physician. But the answer to the question depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored. Though not bound by the statement in the doctor's letter that "Mr. Garcia will be unable to return to any form of employment," because a doctor may not be acquainted with the full range of jobs that a person with Garcia's ailments could fill, the administrative law judge, if he thought this a possibility, should have asked the doctor to specify more exactly what "functions" Garcia is incapable of performing.

---

[10]As discussed above, plaintiff claimed significant restrictions in her function report, so this is a not case where the conflicts are so self-evident that the ALJ did not need to elaborate. Later in his decision, the ALJ acknowledged that plaintiff testified that her activities had declined since she prepared the report. (Tr. at 25.) However, he did not state whether he accepted or rejected that testimony.

Id. (internal citations omitted). Thus, while it is true that opinions on issues reserved to the Commissioner are not entitled to "special significance" or "controlling weight," that is not the same thing as saying they are improper and therefore to be ignored. Bjornson, 671 F.3d at 647-48; see also Roddy v. Astrue, 705 F.3d 631, 638 (7th Cir. 2013) ("Although the ALJ does 'not give any special significance' to such opinions, he still must consider 'opinions from medical sources' in determining the claimant's residual functional capacity.") (quoting 20 C.F.R. § 404.1527(d)(2)-(3)); SSR 96-5p, 1996 WL 374183, at *1 (noting that treating source opinions on issues reserved to the Commissioner are "never entitled to controlling weight or special significance," but that such opinions "must never be ignored"). The matter must be remanded so the ALJ can explain his consideration of the treating source opinions.[11]

## C. Agency Consultants

### 1. Legal Standards

The ALJ must consider any opinions in the record from agency medical and psychological consultants, as they "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2. In weighing these opinions, the ALJ must consider the supportability of the opinion in the evidence, the consistency of the opinion with the record as a whole, any explanation for the opinion provided by the consultant, and any specialization of the consultant. Id.

---

[11]To the extent that the ALJ relied on the consultants' reports, the Seventh Circuit has held that the contradictory opinion of a non-examining physician does not, by itself, suffice to reject a treating source report. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). I also note that earlier in his decision the ALJ stated that no treating or examining doctor indicated that plaintiff met a Listing. (Tr. at 21.) The ALJ must on remand consider Dr. Kirkwood's opinion on the Listings as well.

**2.     Analysis**

The ALJ noted that the agency psychological consultant opined that plaintiff had no restriction of ADL's, no difficulties in social functioning, and moderate difficulties in maintaining CPP, and that she was capable of unskilled work.  The ALJ stated: "This opinion is given significant weight as the records support an ability to perform unskilled work.  The claimant is currently able to work in a dog kennel." (Tr. at 25.)  The problem with this observation is that the ability to learn how to do a task of a given complexity is not the same as the ability to stick with a given task over a sustained period. O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010); see also Craft v. Astrue, 539 F.3d 668, 677-78 (7th Cir. 2008) (finding that a limitation to simple, unskilled work did not account for the claimant's difficulty with memory, concentration, and mood swings).  In other words, the fact that plaintiff was able to learn how to do the work at the dog kennel does not mean that she could sustain full-time work at acceptable standards of productivity.

Relatedly, the ALJ failed to incorporate into the RFC and his hypothetical question to the VE the various "moderate" limitations set forth in the consultant's report.  As indicated above, the consultant found plaintiff moderately limited in her ability to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without unreasonable breaks. (Tr. at 95-96.)  The Seventh Circuit has generally required the ALJ to orient the VE to the totality of a claimant's limitations, including any deficiencies of concentration, persistence, and pace.  O'Connor-Spinner, 627 F.3d at 619 (citing Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009); Kasarsky v. Barnhart, 335 F.3d 539, 544 (7th Cir. 2003); Steele v. Barnhart, 290

F.3d 936, 942 (7th Cir. 2002)).  Ordinarily, that means including them directly in the hypothetical.

Id.

In this case, the ALJ limited plaintiff to non-complex (meaning no arbitration, mediation, or negotiation,[12] and no call center work), low stress work with low production quotas.  (Tr. at 23.)  As indicated above, limiting the complexity of the tasks does not ensure that the claimant can persist in their performance.  See Olson v. Colvin, No. 13-C-0015, 2014 WL 297305, at *4 (E.D. Wis. Jan. 27, 2014).  In some cases, a further limitation to low stress work may account for CPP-related limitations.  See, e.g., Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) (upholding hypothetical for low-stress, low-production work when the claimant's difficulties with CPP arose from stress-induced headaches, frustration, and anger); Johansen v. Barnhart, 314 F.3d 283, 288-89 (7th Cir. 2002) (affirming hypothetical formulated in terms of "repetitive, low-stress" work, which excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's moderate CPP limitations).  However, plaintiff's CPP limitations arise primarily from fatigue and depression, not a stress or panic disorder.  The matter must be remanded for reconsideration of RFC and construction of a complete hypothetical, including plaintiff's CPP limitations.[13]

---

[12]It is unclear what the ALJ meant by arbitration, mediation, and negotiation.  This may be a convention in Ohio, where this ALJ is based (he presided over plaintiff's hearing by video-conference).  See, e.g., Crooks v. Commissioner of Social Sec., No. 5:12-CV-2876, 2013 WL 3057105, at * 4 (N.D. Ohio June 17, 2013); Thomas v. Astrue, No. 1:10-cv-1777, 2011 WL 4496533, at *5 (N.D. Ohio Sept. 27, 2011); Lewis v. Commissioner of Social Sec., No. 1:09-CV-2450, 2011 WL 334850, at *5 (N.D. Ohio Jan. 31, 2011) (same ALJ).

[13]Repeating a contention made in other cases, the Commissioner argues that the ALJ did not have to consider the "moderate" CPP limitations in the consultant's report because they were set forth in the "worksheet" portion of the form, which does not constitute the consultant's RFC assessment.  See, e.g., Klahn v. Colvin, No. 13-C-165, 2014 WL 841523, at *19 (E.D. Wis. Mar. 4, 2014); Olson v. Colvin, No. 13-C-15, 2013 WL 5230799, at *15 (E.D. Wis.

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of September, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

Sept.17, 2013).  However, the consultant did not in the present case use the same checkbox form at issue in the previous cases. (Tr. at 95-96.)  In any event, "an ALJ's decision is not insulated from review just because he relied on a consultant who purported to 'translate' the limitations from the summary section into a narrative RFC allowing work."  Aguilera v. Colvin, No. 13-C-1248, 2014 WL 3530763, at *26 (E.D. Wis. July 15, 2014); see also Yurt v. Colvin, 758 F.3d 850, 2014 WL 3362455, at *7 (7th Cir. July 10, 2014); Olson v. Colvin, No. 13-C-15, 2014 WL 297305, at *4 (E.D. Wis. Jan. 27, 2014).